UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

CHERYL SUTTON,
               Plaintiff,

vs.                                    CIVIL NO. 2:07-CV-14009

                                 DISTRICT JUDGE ARTHUR J. TARNOW
                                 MAGISTRATE JUDGE. STEVEN D. PEPE.

COMMISSIONER OF SOCIAL SECURITY,
               Defendant
_____/

## Report and Recommendation

### 1.      BACKGROUND

Plaintiff, Cheryl Sutton, brought this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) to challenge a final decision of the Commissioner finding that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") or supplemental security income under Title II of the Social Security Act.  Plaintiff and Defendant filed motions for summary judgment.  Both motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is recommended that the Commissioner's motion for summary judgment be **GRANTED** and the Plaintiff's motion for summary judgment be **DENIED**.

### A.     Procedural History

On March 4, 2004, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability due to back pain and depression since September 2003 (R. 86, 139, 322). Plaintiff had earlier been awarded DIB benefits in March 1995 which were

1

terminated in January 1997 ®. 109).  Plaintiff's claim was denied initially and upon

reconsideration.  An administrative hearing was held on October 17, 2006, at which Plaintiff

testified and was represented by counsel (R. 335).  On December 27, 2006, the Administrative

Law Judge ("ALJ") Ethel Revels, issued her decision finding Plaintiff not disabled because she

could perform her light-level past relevant work as a cleaner despite her impairments (R. 24-31).

The Appeals Council denied review on August 3, 2007 (R. 6-8).

**B.**     **Background Facts**

  **1.**     ***Plaintiff's Hearing Testimony and Statements***

         Plaintiff was born on April 16, 1954, and was 52 years old at the time of the hearing (R.

343).  Plaintiff has a high school education and completed some college.  She worked as a part-

time census taker in 1989, and worked part-time for about a week at a Burger King.  Plaintiff last

worked in 2003 as a janitor for 10-12 hours a week and earning over $10,000 a year (R. 345-346,

370).[1]  She said the janitorial work was limited, and she worked with a co-worker who lifted

things that were too heavy for her (R. 346).  She was unable to do parts of the job such as

picking up buckets or heavier trash.  She said the job was constructed for her after she lost her

SSI and was going through a divorce.  Plaintiff left this job when she moved to Michigan to

avoid her ex-husband and an alleged stalker[2] (R. 370).  She is currently living with her younger

brother.

         Plaintiff experiences considerable pain in her back, leg and neck, and tingling in her

--------

[1] Her earnings record shows $10,559 for 2002 and $8,882 for 2003 ( R. 90).

[2] The ALJ's decision states that her ex-husband is the stalker (R. 28), but neither Plaintiff's
testimony nor the record indicate this.

2

hands (R. 348). She also described mental problems, including difficulty being around other people as well as anxiety attacks that make her nervous. She has constant pain mainly in her lower back, and she takes muscle relaxers, Tylenol # 3 and Motrin (R. 349-50). These muscle relaxers make her groggy (R. 351). She lies down at least twice a day and sometimes with a heating pad (R. 352).

Plaintiff testified that she did not go out because of the anxiety, and she previously had stayed in the house for up to two weeks (R. 353). She goes grocery shopping with her brother, but she no longer goes to church (R. 354). With respect to substance abuse, she said she drinks beer infrequently and had used marijuana, nerve pills and taken acid as a teenager (R. 356-57).

Plaintiff said she had difficulties with concentration because different things were going through her head, and noted that she did not sleep well due in part to bad dreams that leave her disoriented (R. 358-60). Plaintiff cried throughout the hearing, and testified that she had crying spells once or twice a week. She takes Prozac and Xanax (R. 361-63). She also testified that she could not sustain activity throughout a work day because of pain, and she needs a two hour break.

Plaintiff said she dusts her house, but does no heavy cleaning (R. 365). She reads westerns and the Bible, watches television, and occasionally plays cards. She was still in counseling and tried to go once a week but sometimes could not leave the house or found it easier to stay at home (R. 367-68).[3]

Plaintiff could sit for one hour 45 minutes at a time, and stand one hour at a time (R. 363-

---

[3] The ALJ's decision states that Plaintiff repeatedly missed her counseling appointments, not only due to her mental disorder but "because other activities such as grocery shopping seemed more important at the time" (R. 30). There is no indication of this reason in the record.

3

64).  She also said she has no difficulty with walking, if not for "hours and hours."  She said she could lift between eight and ten pounds.

Plaintiff said she got Medicaid in 2004 but had a hard time learning where someone on Medicaid could go for counseling (R. 369).

### 2. *Medical Evidence*

On April 3, 2003, Debra Weddington, M.D., of Bristol, Virginia,  noted that Plaintiff had a history of severe neck and back pain (R. 172).  Plaintiff had a history of scoliosis and underwent surgery to place a rod in her spine.  Dr. Weddington noted Plaintiff's complaints about her continued back pain, even before the surgery, and her visits to other medical professionals who had previously provided her with pain medication.  In the past five years, she has used over-the-counter drugs for pain.  Plaintiff described the pain in her neck and middle and low back as sharp, tight, twisting in nature, and worse with bending or lifting.  She rated the pain as a six out of ten in intensity most of the time with occasional ten out of ten pain.  Plaintiff stated that lately the pain in her low back had been radiating down the back of her right leg but she experienced no numbness, weakness, or paresthesia of any extremities associated with her pain.  Plaintiff stated that she had been hospitalized twice because of bipolar disorder and had been receiving Prozac.  Dr. Weddington prescribed Baclofen for pain related to muscle spasms and also gave a prescription for a limited number of pain pills (R. 173).

On May 19, 2003, Dr.  J. Alvarado observed that Plaintiff had been doing well with the medications previously prescribed and was even able to work (R. 174).  Since she ran out of pain medication, she had been having a severe burning pain mainly in her neck radiating all the way down to her mid-back on her left side.  Plaintiff reported that she had been a "nervous wreck" as

she was being stalked.  Police told her that unless her ex-husband attempts to physically harm

her they cannot do anything.  Dr. Weddington prescribed an increased dose of Baclofen, re-

prescribed Vicodin, and added a prescription for Xanax (R. 174).

On August 18, 2003, Dr. Alvarado determined that Plaintiff should remain on Prozac,

Vicodin  and Xanax, and advised her to contact Dr. Weddington for continuing care (R. 174).

On September 4, 2003,Plaintiff came to see Dr. Weddington  for medication refills (R.

175).  Plaintiff requested and received an injection of Decadron, a steroid, for increased pain.

Plaintiff informed Dr. Weddington she was moving to Michigan to live with her brother.

On November 28, 2003, Dr. Weddington provided a report based on Plaintiff's final

September 2003 visit describing Plaintiff as suffering from chronic neck and back pain due to

scoliosis, and having had a Harrington rod placed in her spine in 1981 (R. 178-181).  Dr.

Weddington also described Plaintiff as having a diagnosis of bipolar disorder as well as anxiety

disorder and as having been hospitalized twice for psychiatric treatment.[4]  Dr. Weddington

described Plaintiff as exhibiting limited neck and back motion, low back pain that radiated into

her right leg, but no sensory, motor or reflex deficits.  She walked unassisted with a mildly

antalgic gait.  Medications were somewhat helpful in relieving Plaintiff's symptoms, although

she was not entirely pain free.

Psychiatrist, Dr. Basivi Baddington, performed a consultive examination of Plaintiff for

the Michigan DDS on December 5, 2003, diagnosed dysthymic disorder, and assigned Plaintiff a

---

[4] These hospitalizations occurred in 1993 and 1994, at a time that Plaintiff was actively abusing
alcohol and barbiturates (R. 29).

Global Assessment of Functioning ("GAF") rating of 55[5] (R. 182-85). Plaintiff reported that she had been treated by a psychiatrist for two years but had not seen one since 1993. She said she was currently on Prozac and Xanax, drank alcohol socially and denied drug use (R. 183). Her psychomotor activity was normal. Plaintiff said she attended church regularly, performed light household chores and cooked her own meals. She walked with a normal gait, and appeared mildly anxious.

A Psychiatric Review Technique Form ("PRTF") filled out by Dr. Thomas T. L. Tsai on December 17, 2003, diagnosed Plaintiff with "a medically determinable impairment" of dysthymic disorder "that did not precisely satisfy the diagnostic criteria" (R. 195-208). Dr. Tsai found mild to moderate difficulties relating to domestic activities, social functioning, concentration and persistence, and having episodes of extended decompensation (R. 195-208). The Mental Residual Functional Capacity Assessment completed by Dr. Tsai found that Plaintiff was not significantly limited with regard to understanding and memory, sustained concentration, and persistence (R. 209-12). Dr. Tsai found Plaintiff moderately impaired in her ability to maintain attention and concentration, to complete a normal workday and workweek, to accept

---

[5]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id*. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id*. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id*.

instruction and respond appropriately to criticism from supervisors, and to respond appropriately to changes in work setting (R. 211).  Dr. Tsai stated that Plaintiff can do unskilled work.

Plaintiff saw Dr. Sanghi on February 13 and March 13, 2004 (R. 250-51).  Her spine was tender and she complained of pain.  Dr. Sanghi prescribed Vicodin, Prozac and Xanax, and advised Plaintiff to see a rheumatologist (R. 251).

M. Mong, M.D. saw Plaintiff on May 25, 2004, finding her reflexes were full and equal bilaterally, and straight leg raising was negative to 85 degrees on the right and 90 degrees on the left (R. 213-18).  Dr. Mong diagnosed back pain and scoliosis with status post rod placement, bipolar and depression (R. 217).

A Physical Residual Functional Capacity Assessment completed by V. White concluded that Plaintiff can stand and/or walk (with normal breaks) for a total of about six hours in an 8-hour workday despite her back pain (R. 220).

Dr. Hasan, a Psychiatrist, examined Plaintiff on July 23, 2004, and diagnosing a dysthymic disorder and assigning a GAF of 50-55 (R. 227-30).  Plaintiff reported that she used to drink beer every day and smoke marijuana, but said she had been sober for many years and was never in a rehabilitation program (R. 228). Her posture and gait were normal.  She lived with her brother, had a few friends and no contact with neighbors.  Plaintiff described attending church, cleaning house and cooking meals.  Her mood was mildly anxious and affect appropriate (R. 229).  She recalled two of three objects after three minutes.  She named Bush and Clinton as past presidents and named five large cities.  She did serial sevens to 86 and interpreted proverbs abstractly.

Psychologist, Dr. Kriauciunas, reviewed the evidence of record on September 11, 2004,

and found Plaintiff limited in some abilities related to understanding and memory, sustained concentration and persistence, social interaction and adaptation, but concluded that Plaintiff could perform the mental and emotional requirements of unskilled work (R. 231-34). He also found that Plaintiff does not have any episodes of extended decompensation that would limit her functioning (R. 246).

Plaintiff sought treatment for her back complaints with Michael L. Gambel, M.D. on November 10, 2005 (R. 273-87). In December 2005, Dr. Gambel observed no mental or psychosocial abnormalities, and no reflex, strength, coordination or sensation deficits (R. 283). A chest x-ray showed the Harrington rod in place and stabilizing a mild to moderate convex right thoracic scoliosis (R. 291). Bone density tests that were normal (R. 314). Plaintiff continued to report low back pain (R. 298). Dr. Gambel's subsequent records primarily document medication refills as she was prescribed Tylenol # 3, Motrin, Zantac, Raboxin, Prozac and Xanax (R. 273-79, 295-309)..

Plaintiff began participating in counseling at The Guidance Center on August 29, 2006 (R. 252-66). Her initial diagnosis was major depressive disorder and severe panic disorder with agoraphobia and a GAF of 50 (R. 256). Bipolar disorder was ruled out. Subsequently, a psychiatrist changed the diagnosis to a major depressive disorder and social anxiety with a GAF of 55 (R. 259). Plaintiff was dysphoric, anxious and cried during the intake interview (R. 254). Plaintiff reported taking Tylenol # 3 and Motrin for her back pain as well as Robaxin and Zantac (R. 257). Plaintiff missed a number or counseling sessions (R. 260, 261, 265).

### 3. *Vocational Evidence*

Vocational expert ("VE") Dr. Lois Brooks testified that Plaintiff's past janitorial work

was light-level and unskilled (R. 370).

ALJ Revels asked the VE Brooks whether she could identify any jobs that could be performed by an individual with Plaintiff's age, education and work experience, who needs work that will allow for a sit/stand option, that would not require sitting more than an hour and 45 minutes, and would not require standing for more than one hour. The individual would require work that does not involve interaction with the general public, work at hazardous heights or around dangerous machinery and involves only occasional climbing, requires no crawling and crouching, and no lifting of more than ten pounds frequently or up to 20 pounds occasionally . The individual is moderately limited in the ability to maintain concentration for extended periods, as well as to carry out detailed instructions, thereby limiting her to those simple, repetitive type jobs or what are called unskilled work. (R. 371-72) The VE testified that in Southeast Michigan there are over 6,000 sedentary jobs including assembly work (3,000), inspecting (1,700) and packaging (1,700). (R. 372).

When asked to modify the previous hypothetical to include the ability to stand and walk a total of six of eight hours with the need to occasionally sit for a period of time, VE Brooks replied that such a person would still be limited to sedentary work (R. 372-74).

### 4.    *ALJ Revel's Decision*

ALJ Revel found that Plaintiff meets the disability requirements for insured status through the date of this decision, and he has not engaged in substantial, gainful activity since the alleged onset date of disability (R. 27).

Plaintiff has "severe" impairments of scoliosis post placement of a Harrington rod in 1981 and a depressive disorder under 20 C.F.R. 404.1520(c) and 416.920(c). Plaintiff, however,

does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 27).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the Plaintiff's statement concerning the intensity, persistence, and limiting effects of these symptoms are not totally credible (R. 30). ALJ Revels determined that the Plaintiff has the residual functional capacity to lift twenty pounds occasionally and ten pounds frequently, stand/walk six of eight hours, occasional climbing, balancing, stooping, kneeling, crawling or crouching, and limited to simple repetitive unskilled work with no interaction with the general public (R. 27).   Based on that finding, ALJ Revels determined Plaintiff cold perform her past work as a cleaner.

## II.   ANALYSIS

### A.   <u>Standards of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

In her motion for summary judgment, Plaintiff raises eight issues:

**1.    The ALJ erred in her conclusion that claimant can perform light work as defined in 20 CFR 404.1567 (b), including her past work**

Plaintiff contends the ALJ erred in finding she could perform her light-level past work (Dkt. #12, p. 6-7).  Plaintiff contends the ALJ misrepresented her testimony as to her ability to sit and stand; erred by not finding that she needed a sit/stand option; failed to accommodate her mental impairment; and failed to consider the effects of her medications.

The Plaintiff bears the burden of proving that she is unable to perform her past relevant work.  *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989).  Plaintiff worked as a cleaner in Virginia, and she described no difficulties performing this job except

---

[6] *See, e.g.*, *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

lifting heavier buckets and trash.  The record does not document any exacerbation of Plaintiff's physical or mental impairments at any time relevant to her application for disability benefits. Additionally, no doctor of record described Plaintiff as disabled, nor did any doctor describe her as experiencing limitations that would prevent her from performing unskilled light-level work. While Plaintiff suggests that a GAF score of 55 is "at least, severely limiting" (Dkt. #12, p. 7), no doctor has described her as unable to work due to mental impairments.  The only mental health professional that did comment on Plaintiff's capabilities described Plaintiff as able to perform unskilled work (R. 231-34).  Her mental impairments did not limit her cleaning job in Virginia. Considering record evidence, an ALJ could reasonably conclude that Plaintiff is capable of light-level and her past relevant work.

Plaintiff claims that the ALJ asked the VE an incomplete hypothetical question because she misrepresented Plaintiff's testimony and did not include all of Plaintiff's impairments and limitations.  Under the five-step sequential evaluation process for determining whether an individual is disabled, the evaluation may end once it is determined that the claimant is or is not disabled and there is no need to go on to the next step (R. 25).  Because the ALJ determined, at step-four of the evaluation process, that Plaintiff was not disabled and had the Residual Functional Capacity to do her past relevant work, it was not required to proceed to step-five to inquire whether other appropriate work existed.

The hypothetical question included a sit-stand option that reduced the exertional level to sedentary according to VE Brooks.  VE Brooks testified that Plaintiff's past janitorial work was light-level and unskilled (R. 370).  Yet, ALJ Revels did not find a ne3d for a sit-stand option in determining that Plaintiff could do her past light level work as a cleaner.  Plaintiff left this job to

move to Michigan, not because of an of her impairments

### 2. The ALJ did not properly assess Plaintiff's mental Residual Functional Capacity ("RFC") and limitations due to her 'severe' depressive disorder

Plaintiff contends the ALJ erred by not appropriately enumerating the "work-related functions" affected by her mental impairments (Dkt. #12, p. 8-9). As such, the ALJ did not properly assess Plaintiff's mental RFC and limitations due to her 'severe' depressive disorder.

An individual's RFC is her ability to do physical and mental work activities on a sustained basis despite limitation from her impairments (R. 26). In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. The ALJ concluded that Plaintiff could perform simple, repetitive, unskilled work that did not require interaction with the general public. The ALJ discussed the evidence regarding Plaintiff's mental health in detail, and set forth her reasons for the assessment of Plaintiff's mental and emotional functional capacity. The only mental health professional to express an opinion on Plaintiff's ability to perform work described Plaintiff as capable of performing unskilled work (R. 231-34). Psychologist Dr. Kriauciunas reviewed the evidence of record on September 11, 2004, and found the Plaintiff limited in some abilities related to understanding and memory, sustained concentration and persistence, social interaction and adaptation, but concluded that Plaintiff could perform the mental and emotional requirements of unskilled work. The ALJ's conclusion indicated Plaintiff has the "severe" impairment s of scoliosis post placement of a Harrington rod in 1981 and a depressive disorder (R. 27). She further noted that the scoliosis limits Plaintiff's ability to lift while the depression has caused moderate difficulties in maintaining social functioning, concentration, persistence or pace. Finding the Plaintiff capable of performing past relevant work as a cleaner, the ALJ noted that the work does not require the performance of

work-related activities precluded by the Plaintiff's RFC (R. 31).

Based on an examination of the record ,as well as the testimony provided by Plaintiff and VE Brooks, an ALJ could reasonably find that Plaintiff's RFC and her limitations on account of depression did not prevent Plaintiff from performing sedentary, unskilled work.

### 3.     The ALJ erred by not finding that "moderate" limitation of concentration precluded the performance of all work

Plaintiff argues that the ALJ's finding that her concentration was "moderately" limited mandates an award of benefits (Dkt. #12, p. 10).  Under the previously used evaluative scale, deficiencies in concentration, and other areas, were rated on a five-level range of frequency: never, seldom, often, frequent and constant.  C.F.R. 404.1520a(c)(4) has since been amended to encompass a five-level scale based on severity rather than frequency of the limitation.  The current scale rates severity as none, mild, moderate, marked and extreme.  Thus, Plaintiff contends a finding of  "moderately limited" is equivalent to "often," and under *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), such a limitation necessarily requires a finding that a claimant is disabled.

In *Bankston*, the Court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment."  *Id.* at 826.  The Court then determined that under the relevant portion of the PRTF, "often" should logically be defined as fifty percent of the time.  *Id*. at 827.  There, the finding that the claimant "often" had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a judgment of disability and a remand for award of benefits.

Yet, the Sixth Circuit has since held that an ALJ's failure to include in a hypothetical

14

question a PRTF finding that a claimant "often" has difficulty concentrating is not a basis for

remand when the hypothetical question adequately describes that claimant's limitations arising

from a mental impairment.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).   In *Smith*, the

ALJ marked on the PRTF that Smith "often" suffered deficiencies of concentration, persistence

or pace, but did not include that finding in the hypothetical question to the VE.  Smith, relying

on cases similar to *Bankston*, argued for a remand based on that omission.  The Sixth Circuit,

without citing *Bankston,* held that the hypothetical question asked by the ALJ was adequate.

The court noted that while the ALJ checked a single box for "often" in a 1-5 rating scale on the

PRTF,

> the ALJ went beyond this simple frequency
> assessment to develop a complete and accurate
> assessment of Smith's mental impairment . . . .  In
> particular, the ALJ relied on the testimony of four
> physicians who characterized Smith's concentration
> problems as minimal or negligible.  The ALJ then
> translated Smith's condition into the only concrete
> restrictions available to him–examining psychiatrist
> Schweid's recommended restrictions against quotas,
> complexity, stress, etc.– and duly incorporated them
> into his hypothetical to the vocational expert.

*Id.* at 379.[7]

    The Court distinguished several unpublished district court cases similar to *Bankston*

because the ALJ's in those cases did not include in the hypothetical question the finding that the

claimant "often" had difficulty concentrating, nor did they otherwise account for such a

limitation.  *Id.*  Thus, when the ALJ makes a finding that the claimant "often" has problems with

---

[7] It seemed significant to the court in *Smith* that the ALJ had noted there were four physicians who characterized Smith's concentration problems as minimal or negligible.  In this case there is less weighty counter-evidence concerning the degree of concentration limitations than in *Smith*.

concentration, but does not specifically include that limitation in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.

ALJ Revels directly addressed and discounted many of Plaintiff's claims of physiological impairments, but she accepted that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace.  ALJ Revels presented the VE with a hypothetical that included the inability to remember detailed instructions and described the concentration related problems.  While the inability to remember detailed instructions would preclude semi-skilled and skilled work, VE Brooks testified that such an individual could perform unskilled work such as inspecting and packaging (R. 372).   ALJ Revels could reasonably conclude that Plaintiff's mental limitations were not inconsistent with unskilled jobs at the light level such as the cleaning job.  Again, there is no indication that Plaintiff's mental limitations interferred with her ability to perform that job in Virginia.

Plaintiff further argues that the "moderate" limitation on her ability to concentrate renders her unable to perform any substantial gainful activity.  No mental health provider expressed that opinion.  The ALJ considered Plaintiff's legitimate impairments, in combination, and determined that Plaintiff retained the RFC to perform a limited range of light and unskilled work.  ALJ Revels, at the hearing and in her decision, properly addressed Plaintiff's "moderate" limitations.  Based on the totality of the record, ALJ Revels could reasonably conclude that Plaintiff's limitations did not preclude performance of Plaintiff's prior work as a cleaner.

### 4.    The ALJ erred in his assessment of Plaintiff's physical RFC because it is based upon an unsigned medical report

Plaintiff contends the ALJ committed an error in her assessment of Plaintiff's physical

RFC by relying upon an unsigned medical report (Dkt. # 12, p. 11).  Plaintiff states that the ALJ's finding of physical exertional limitations mirror those in the Physical Residual Functional Capacity Assessment (R. 219-26) and must have been derived from the report, which is not personally signed, but rubber stamped with a signature.  Plaintiff cites to 20 C.F.R. 404.1519n(e), which states that "[a]ll consultive examination reports will be personally reviewed and signed by the medical source who actually performed the examination. . . A rubber stamp signature of a medical source or the medical source's signature entered by any other person is not acceptable."

Plaintiff's argument lacks merit.  Even if the ALJ's finding is consistent with the limitations described in the unsigned medical report, there exists ample evidence in the record to confirm the findings from this medical report.  The ALJ's conclusion included careful consideration of the entire record noting Plaintiff's past janitorial work; the stable condition of her back post-surgery, albeit with some pain and muscle spasm; the fact that for a period her only pain medication was over the counter medication, as well as the fact that Plaintiff left her janitorial job not due to her health but rather because she was moving from Virginia to Michigan (R. 30, referring to R. 345-46, 350, and 370).  Plaintiff also testified that she shopped for groceries and could lift 8 - 10 pounds, and stand a couple of hours (R. 354, 363).

Given the totality of the evidence, ALJ Revels could have reached the same determination about Plaintiff's RFC without the unsigned medical record.  Accordingly, ALJ Revels reasonably could have determined Plaintiff's RFC without the unsigned medical record.

**5.      The ALJ erred in considering Plaintiff's past relevant work as a cleaner to be substantial gainful activity**

Plaintiff contends the ALJ in considering Plaintiff's previous work as a cleaner to be past

17

relevant work and substantial gainful activity (Dkt. #12, p. 12-13).  Plaintiff contends she

worked part-time under special conditions and benefitted from considerable employer

accommodations.

The ALJ reasonably concluded that Plaintiff's earnings from her job as a cleaner created

a presumption that she was performing at the level of substantial gainful activity.  Part-time work

can constitute substantial gainful activity.  *See* 20 C.F.R. 404.1572(a), 404.1573(e), 416.973(e).

As Plaintiff acknowledges, she earned $880.00 per month at this job, considerably in excess of

the amount needed to create the presumption of substantial gainful activity.  20 C.F.R. 404.1574,

416.974.  As Plaintiff was being paid for her janitorial work, it was reasonable for the ALJ to

presume she was providing services justifying the income earned by her.  Plaintiff did not

describe any special accommodations other than that a co-worker helped her lift heavy items (R.

346).  Plaintiff also ended this job for reasons unrelated to her health (R. 370).  The ALJ did not

err in her consideration of Plaintiff's past relevant work as a cleaner to be substantial gainful

activity.

**6.      The ALJ erred in failing to analyze the mental demands of Plaintiff's past work**

Plaintiff contends the ALJ committed an error by failing to assess the specific mental

demands of her past work (Dkt. #12, p.14).  She quotes S.S.R. 82-62, which states:

> . . . for a claim involving a mental/emotional impairment, care must
> be taken to obtain a precise description of the particular job duties
> which are likely to produce tension and anxiety, e.g., speed,
> precision, complexity of tasks, independent judgments, working with
> other people, etc., in order to determine if the claimant's mental
> impairment is compatible with the performance of such work.

S.S.R. 82-62.

18

The ALJ questioned Plaintiff about her past work and asked for the necessary descriptions. Plaintiff bears the burden of proving that she is unable to perform her past relevant work. During testimony or otherwise in the record, Plaintiff offered no explanation why she was unable to perform her past work as a janitor. Plaintiff does not identify a single aspect of her past work that she would be unable to perform. Moreover, Plaintiff did not leave her past job due to health reasons, leaving no indication as to why she could not have continued such work once she re-located to Michigan.

### 7.    The ALJ erred in her assessment of Plaintiff's credibility and did not properly analyze all relevant credibility factors

Plaintiff contends the ALJ's findings as to credibility are completely spurious and not ground in evidence (Dkt. #12, p. 15-16). Plaintiff claims the ALJ made an error in assessing the evidence and cites to specific factors: inconsistent statements regarding her work history; a lack of candidness regarding her substance abuse; the fact that she was stable on medications; and her repeated missing of counseling appointments.

Subjective evidence is only considered to "the extent…[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion. *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility

determination must be accompanied by a detailed statement explaining the ALJ's reasons.

S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but

rather they must be specific.  The ALJ must say more than the testimony is not credible.  *Felisky*

*v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount

the medical evidence and claimant's daily activities and then without analysis summarily

conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory

findings to substantiate the claimant's testimony regarding pain.  *Id*. at 1039.

ALJ Revels found Plaintiff could perform light work with certain exertional limitations.

The ALJ is entitled to make her own credibility assessment so long as she evaluates Plaintiff's

allegations of symptoms and limitations in light of the record as a whole (R. 27-31).  20 C.F.R.

§§ 404.1529(c), 416.929(c).  Here, this included reviewing Plaintiff's detailed hearing testimony

in light of a larger medical record..

ALJ Revels had substantial evidence to discredit Plaintiff's subjective testimony.  While

Plaintiff's medically determinable impairments could reasonably be expected to produce the

alleged symptoms, ALJ Revels found that Plaintiff's statements concerning the intensity,

persistence and limiting effects of those symptoms were not entirely credible.  As the ALJ noted,

Plaintiff's medical record indicates that her back condition has been stable since surgery, and for

much of the time only over the counter drugs were used to treat her pain and her doctor indicated

she did not need an assistive device (R. 30).  Plaintiff's medications have been unchanged for

several years, suggesting her condition is stable.  The record consistently describes Plaintiff as

performing chores such as housework, cooking and shopping (R. 182-85, 227-30).  Again,

Plaintiff did not stop her work as a cleaner because of her scoliosis or other health reasons, but

rather because she moved (R. 30).  Further, the ALJ found that the medical record, including

hearing testimony, did not support Plaintiff's claims of a RFC precluding any work..

### 8.    The ALJ denied Plaintiff's due process rights by not reopening the final decision on a prior application

Absent a constitutions violation, a decision by the Commissioner not to reopen a prior

case is not a "final decision of the Secretary" and is therefore not subject to judicial review.

*Califano v. Sanders*, 430 U.S. 99 (1977). Plaintiff contends ALJ Revels denied her due process

rights by failing to reopen the final decision on her initial decision (Dkt. #12, 17-18).  Plaintiff

was unrepresented at the time of that application and she claims that she lacked the capacity to

understand her appeal rights.  She also states that her second application was within one year of

the first and she submitted new and material evidence requiring the reopening of the prior

decision.

Under S.S.R. 91-5p, Plaintiff must submit evidence that mental incapacity may have

prevented her from understanding the review process.  The determination must consider the

factors existing at the time of the prior administrative action, including "any mental or physical

condition which limits the claimant's ability to do things for him/herself." Plaintiff has failed to

establish a mental condition that affected her ability to understand the administrative process

during her initial claim for benefits and therefore no violation has occurred.  *Ison v. Comm'r of

Soc. Sec.*, 172 F.3d 48 (Table), 1998, WL 898874 (6th Cir. 1998))  Additionally, there is no

evidence of an appeal to reopen the case.  The ALJ considered all the evidence of record,

including evidence submitted with her prior application and which predated her alleged onset of

disability.  Plaintiff does not identify evidence indicating that she was disabled during a period

prior to that covered by her March 2004 application, nor does she describe any advantage she

would receive if her prior application had been expressly reopened.

**III.   RECOMMENDATION:**

For the reasons stated above, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's motion be **DENIED**.  Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


DATED: February 23, 2009                    s/ Steven D. Pepe
Ann Arbor, MI                               STEVEN D. PEPE
                                           United States Magistrate Judge

Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 23, 2009 .

s/Jermaine Creary
Deputy Clerk